## APPEAL OF THE SAXMAN COAL & COKE CO.

Docket No. 1013.   Submitted April 4, 1925.   Decided June 26, 1925.

*W. W. Spalding, Esq.*, for the taxpayer.
*Benj. H. Saunders, Esq.*, for the Commissioner.

Before GRAUPNER, LANSDON, and LITTLETON.

This is an appeal from a determination of a deficiency in income and profits taxes for the calendar years 1917 and 1918, in the amounts of $1,485.09 and $66.25, respectively. The questions presented are (1), the value at which certain coal-land leases purchased in 1909 may be included in invested capital; and (2), the value on March 1, 1913, of the leases so acquired for the purpose of computing an allowance for exhaustion.

At the hearing the Commissioner amended his answer so as to allege that instead of the disallowance of $86,500, the value claimed for the leaseholds by the taxpayer, he should have disallowed, in computing invested capital, the sum of $134,904.24. No evidence was submitted to support this allegation.

### FINDINGS OF FACT.

The taxpayer was incorporated under the laws of West Virginia on September 8, 1909, as successor to Saxman Coal & Coke Co., with an authorized capital stock of $200,000. The predecessor corporation, Saxman Coal & Coke Co., had been incorporated on July 1, 1907, with a capital stock of $50,000 paid in cash. On January 27, 1908, it leased from the Gauley Coal Land Co. approximately 4,400 acres of coal land in Nicholas County, W. Va., together with the right to use at the lessee's expense a 3½-mile logging road, theretofore constructed by the lessor, for the purpose of hauling its coal and coke out to the common carrier. About July 14, 1909, the predecessor corporation acquired another coal lease from the Cherry River Coal Mining Co., covering approximately 3,800 acres of land in Nicholas County, W. Va. Both leases provided for a royalty of 10 cents per gross ton. Due to the inability of the lessee to operate under this royalty, the same was reduced by the lessor in 1919 to 5

cents per ton. The leases were for a period of 30 years with the right of renewal, and were acquired without cost.

The entire capital of $50,000 was invested by the predecessor corporation in mine plant and equipment. In addition it borrowed considerable sums of money, all of which were similarly invested in plant and equipment. The debts so incurred were assumed by the taxpayer when it took over the assets of the predecessor corporation in September, 1909.

For the net assets and in discharge of the liabilities of the predecessor corporation, taxpayer, upon incorporation, issued to the stockholders of the predecessor corporation its capital stock, having a par value of $161,000. At the same time $500 of stock was sold at par for cash. Later, in 1909, $9,500, and in 1911, $4,700, of stock was sold at par for cash. Thus there was issued and outstanding during the taxable years 1917 and 1918 stock of taxpayer having a par value of $175,700. The physical assets of the predecessor corporation, consisting of plant and equipment, were taken over by taxpayer at cost, without appreciation, and since acquisition have stood on taxpayer's books at cost, less depreciation and plus additions.

Among the assets acquired from the predecessor corporation were the two leaseholds covering 3,800 and 4,400 acres, respectively, which the taxpayer set up on its books at the time of acquisition at a value of $86,500. The value at which the leases were entered upon the books and which is now claimed as the amount which should be included in invested capital for 1917 and 1918, and accepted as the value on March 1, 1913, for the purpose of an allowance for exhaustion, was based upon what the president of the corporation thought the leases were worth and not upon a determination of the amount of coal recoverable.

During 1912 taxpayer constructed a number of beehive coke ovens, but due to unfavorable operating conditions these coke ovens were soon abandoned.

The facts surrounding the extraction of coal under the leases here involved were set forth by taxpayer in its questionnaire executed October 4, 1921, and filed as an exhibit, as follows:

On the date of acquisition there were two openings on lease No. 1, i. e., Saxman No. 1 mine and Saxman No. 2 mine, both of which have since been abandoned on account of running out of workable coal. Saxman No. 4 mine was since opened on this lease and is now the only asset of any value. Saxman No. 3 mine was opened on lease No. 2 and is now under process of abandonment for similar reasons as Nos. 1 and 2.

There has never been any drilling on the property to determine what might be expected in the various sections thereof. The openings or mines were started at points where the coal " outcropped " and where the coal seam showed a workable thickness. This thickness, however, failed to maintain and the farther the development proceeded the thinner the coal seam got, so much so, that in mines Nos. 1 and 2 the thickness reached the low point of eighteen

inches which made it necessary to abandon any further prospecting. So after all the expense that was put in these mines we were forced to abandon them. This abandonment was a great loss to us from the fact that the major part of our investment was in the coke ovens and tipple at these mines and there can possibly be no salvage. The coke ovens are an entire loss and the tipple can not be moved to the other openings.

Mine No. 3 on lease No. 2 is working under the same conditions as Nos. 1 and 2, and we are now drawing the pillars and stumps preparatory to abandoning it. While this work is in progress we are still advancing the main headings in the hope of locating workable coal, and this advance work is very expensive prospecting.

Mine No. 4 was opened in 1919 on lease No. 1 and as with the other mines the " outcrop " showed four feet of coal whereas the advanced headings are now only showing two feet and every other indication points to the same conditions as we found in Nos. 1 and 2.

The conditions above described have made it impossible to produce one-tenth the amount of coal which could have been produced from the four mines if the seam had proved of uniform workable thickness.

Since 1916 it has been evident that our former estimate in 1914 of a life of twenty years, as a rough basis for determining a proper allowance for depreciation and depletion, was probably much too optimistic. It is more than probable that the company will be faced with the necessity of writing off during the next five years the entire remaining amount of its capital investment, less any salvage. This will certainly be the case unless further developments of the coal seam prove more successful than those now in evidence.

### DECISION.

The determination of the Commissioner is approved.